## SMITH *v.* LUCAS.

Upon the trial of an action, it became a material question whether the son of the defendant, as agent for his father, agreed with the plaintiff that a trade concerning a yoke of oxen should be rescinded. The plaintiff called the son of the defendant as a witness, who testified that he went to see the plaintiff " for my father ; whatever I said was what my father told me." He then testified as to what was said and done. The plaintiff was then permitted, subject to the defendant's exception, to testify, in contradiction of the defendant's son, as to what was said and done on the occasion referred to. He was also allowed, subject to exception, to offer evidence that the defendant's son had previously stated the facts in a different manner. There was no collusion between the plaintiff and the defendant's son, who was hostile to the plaintiff and friendly to the defendant. *Held,* that there was no error in the admission of any part of this evidence.

ASSUMPSIT, by Irving E. Smith against William Lucas, originally commenced before a justice of the peace, and brought to this court on appeal. The plaintiff claimed to recover five dollars, which he alleged that the defendant agreed to pay, in consideration of the plaintiff's agreeing to take back a yoke of oxen which he had sold to the defendant. It was admitted that the plaintiff had sold the oxen to the defendant for $150 and the right to use them for five days, and that the trade was subsequently rescinded, and the oxen returned to the plaintiff. The plaintiff testified that, shortly after the sale to the defendant, the defendant's son, Frank, came to see him. The defendant objecting that Frank's statements were not evidence against him, the plaintiff's counsel suspended the plaintiff's examination, and called Frank Lucas, a boy of fifteen years of age. Frank testified, in substance, as follows : " I went over to tell Smith that the oxen were not what my father thought them, or not what they were said to be ; and that father wanted Smith to take them back. I went for my father. Whatever I said was what my father told me. Smith said he would take them back for five dollars. I returned home and told father. Father told me to take the cattle back to Smith, and gave me half a dollar to give Smith for one half day's work of the oxen. Father said he would rather lose fifty dollars than give Smith five dollars. I drove the oxen to Smith's, and told Smith that he could have his choice,—to take the oxen and the half dollar, or keep the oxen, work them five days, and return them. Smith took the half dollar and the oxen."

Subject to exception, the plaintiff was then permitted, under a *pro forma* ruling, to testify, in substance, as follows : " Frank said his father wanted me to take the oxen back ; that he couldn't get the money to pay until March. I offered to take them back if his father would pay me five dollars, and pay for the work of the oxen. Frank went off,

came back with the oxen, said he had told his father; that his father would pay me the five dollars the next time he saw me; that his father said he would rather pay me than keep the oxen. He then paid me half a dollar for the work." Subject to exception, the plaintiff was afterwards allowed to show that, some time after the return of the oxen, the plaintiff asked Frank if he did not say that his father said he would pay the five dollars; and that Frank replied, that his father sent word that the first time he saw Smith he would settle; that he didn't tell Smith that his father would pay the five dollars, but that he told him that his father would call and settle with him. There was no collusion between the plaintiff and Frank Lucas; on the contrary, Frank was hostile to the plaintiff, and friendly to the defendant. The defendant denied authorizing Frank to promise Smith five dollars. Verdict for plaintiff. Motion to set aside verdict. Case reserved.

*Burns & Heywood*, for the defendant.

The plaintiff, knowing the situation in which the witness, Frank Lucas, stood to the defendant (the plaintiff's evidence detailed in the case shows this), called him as a witness, and it was no surprise to him that Frank did not testify as he (the plaintiff) claimed the facts to be; and to allow the plaintiff to contradict this witness, which he had called to the stand, would be in direct conflict with the well established rule of the common law—*Ryerson* v. *Abington*, 102 Mass. 530, 531; and by this proceeding he (the plaintiff) gets before the jury his version of what occurred between himself and Frank, without proving that the defendant should be bound by what Frank might do with the plaintiff in the defendant's name; and the plaintiff could not, as direct evidence, testify to the same matter himself, and his evidence was therefore suspended when Frank was called, because the plaintiff could not go on with his direct evidence upon that point. It seems to us that the plaintiff here makes substantive evidence of that evidence which the plaintiff can only use to contradict the witness Frank, had he been called by the defendant as a witness. This case has no resemblance to that of *Hurlburt* v. *Bellows*, 50 N. H. 105, where the evidence given by the witness, when called by the plaintiff, was entirely distinct from that given when he was afterwards questioned by the defendant Bellows, and upon which the plaintiff was allowed to contradict the witness. In the case at bar, the plaintiff is allowed to try the experiment of calling the witness, and, because he does not testify to satisfy him, to contradict the evidence given when witness was called to the stand and questioned by the plaintiff's counsel.

*Ray & Drew* for the plaintiff.

Frank Lucas testified that he went for his father, the defendant, to see the plaintiff, and to have him take back the oxen; and " whatever I said was what my father told me." The meaning of which is, that

he went to the plaintiff and made such a bargain with him, in regard to taking back the oxen, as his father authorized him to make. The question before the jury was as to what that bargain was. The witness, Frank Lucas, testified that the plaintiff took them back, on the payment of fifty cents to pay for what the defendant used them, and that there was no promise to pay five dollars, the sum for which the suit was brought. The plaintiff testified that he made an offer to Frank, the witness, to take the oxen back for five dollars and the pay for the work; and that Frank went off, and came back and said that his father, the defendant, would pay the five dollars, and would rather pay that than keep the oxen. We do not see that there can be any objection to this testimony. It was a question for the jury, on this testimony, to find as to what Frank, the witness, did say that his father would do; and as to this the plaintiff could testify as well as any one; and whatever he did say we have the direct testimony of Frank that he was authorized by his father to say. *Alexander* v. *Gibson*, 2 Camp. N. P. 556; *Friedlander* v. *London Assurance Co.*, 4 B. & Ad. 193. It seems to us that the only question in the case, upon which there can be any doubt, is the testimony admitted tending to contradict Frank, the witness, by his sayings out of court. The plaintiff put him upon the stand, and, as we say, was surprised by his testimony as to what the bargain was. The plaintiff was compelled to put him upon the stand to show that he was authorized by his father to agree to pay the five dollars. He testified that he was authorized to make whatever contract he did make, but that he did not agree for his father to pay the money in controversy. The plaintiff was then allowed to prove that Frank had, after the oxen were taken back, made admissions not consistent with this part of his testimony on the stand. We contend that this was fully warranted by the authorities. 1 Greenl. Ev., sec. 444; 2 Phil. Ev. 448 *et seq.*; *Jameson* v. *Blodgett*, re-cited in Coös, July T., 1869, and not reported; see the case, *Hurlburt* v. *Bellows*, 50 N. H. 105.

Foster, J. It was very material to the plaintiff's case to show what Frank Lucas said, because, if any contract of the kind declared on was made between the plaintiff and the defendant, it was made on the defendant's part by his son Frank, as agent for his father. It was a verbal contract, concerning which there was no other disinterested witness, no person being present at this conversation, as we infer, except the plaintiff and Frank Lucas. The contract was all embodied in the conversation between them, which the plaintiff was going on to relate, when the defendant objected that Frank's statements were not evidence against him. The objection was well taken, and must have been sustained by the court if the plaintiff had not recognized the force of it, and submitted to it; because the statements of Frank were quite immaterial, unless it were shown that Frank was the agent of the defendant, and authorized to make the promise relied on by the plaintiff.

The fact of agency could only be proved by calling, as a witness, Frank, or his father,—at least, it does not appear that any other person had knowledge of the fact. It was, therefore, proper and legal, as well as indispensable to the plaintiff's case, that he should offer the testimony of Frank. Being placed upon the stand, Frank admitted, in substance and legal effect, that he went to the plaintiff as the agent of the defendant, and that whatever he then said was what his father, the defendant, told him to say. The plaintiff might have suspended the examination of Frank at this point, and then have testified himself to the declarations of Frank; but he had the right to go further, and prove the contract by the testimony of Frank. If the plaintiff told the truth in giving his subsequent account of the conversation, he had the right to suppose that Frank would tell the same story. But Frank gave a very different version of the matter, and one fatal to the plaintiff's case, if credited by the jury; and the plaintiff, if truthful himself, must have been greatly surprised by the character of Frank's testimony.

There was no collusion between Frank and the plaintiff, and the plaintiff understood the situation, that Frank was the son of the defendant; but, if he was conscious that the truth was as he himself maintained, he might reasonably rely upon the testimony of Frank, in aid and confirmation of his own. But the plaintiff was not obliged to rely solely upon the testimony of Frank, nor was he precluded from offering his own or any other testimony that it might have been in his power to produce, simply because his attempt to prove his case by the son of his adversary was a miserable failure.

It is not uncommon that a party offers a witness who does not help him, and it would be strange if he were to be concluded by the results of a fair and proper though hazardous experiment. We are entirely unable to perceive any grounds upon which the defendant's first exception can be sustained.

In *Alexander* v. *Gibson*, 2 Camp. N. P. 555, a witness was called by the plaintiff to prove that the horse, which was the subject of the controversy, had been sold to the plaintiff by the defendant's servant, who warranted the horse to be sound. Afterwards, the plaintiff voluntarily called the servant himself, who swore positively, upon direct examination, that he was expressly forbidden by his master to warrant the horse, and that he had not given any warranty. The plaintiff's counsel, nevertheless, called another witness to prove that at the time of sale the servant declared that " the horse was sound all over." It was objected that the plaintiff was not now at liberty to contradict his own witness. But Lord ELLENBOROUGH said,—" If a witness is called, on the part of the plaintiff, who swears what is palpably false, it would be extremely hard if the plaintiff's case should, for that reason, be sacrificed. But I know of no rule of law by which the truth is, on such an occasion, to be shut out, and justice is to be perverted. *  * If a witness is called, and gives evidence against the party calling him, I think he may be contradicted by other witnesses on the same side."

The plaintiff's testimony in contradiction of Frank's statements was

not, to be sure, offered for the purpose of a general impeachment of the witness, upon whom he still relied to prove the fact of agency. It was evidence competent, independent of that question, to prove one of the main facts in issue in the case. As such, we must regard it as en-tirely unexceptionable. But the objection, we suppose, is, that, by this special impeachment, the party represents that witness to be unworthy of credit upon whom he relies to prove the independent fact of agen-cy. It does not follow, necessarily, that the jury, believing the plain-tiff, must therefore discredit the testimony of Frank in every particu-lar, and conclude that he had no authority to make any statement as the agent of his father. The agency, though a material fact, is not so important as the question what did the agent say.

It is said, indeed, by Lord ELLENBOROUGH, in the case cited, that "a party is not to set up so much of a witness's testimony as makes for him, and to reject or disprove such part as is of a contrary tendency." This rule, however, if it be correct, cannot be strictly and literally ap-plied to a case like the present, where the part of the witness's testi-mony, which is uncontradicted by the plaintiff, namely, the son's agency, was entirely independent of the main issue, was merely intro-ductory, and was, in fact, relied on by both sides. See 2 Phil. Ev. 449.

The second exception is more formidable in appearance, but, as we regard it, groundless in substance. This relates to the introduction of evidence concerning statements made by the witness Frank, inconsis-tent with his evidence on the stand. Whether this evidence was admitted because the court found, in its discretion, that the plaintiff was surprised, does not clearly appear from the case. If received upon this ground, the case falls clearly within the principle of *Hurlburt* v. *Bellows*, 50 N. H. 105, 116. Upon the evidence of Frank, and the subsequent testimony of the plaintiff, the presiding judge might have found that the plaintiff was taken by surprise at the testimony of Frank: the judge did find that there was no collusion between the plaintiff and Frank, but that the latter was hostile to the plaintiff and friendly to the defendant. In *Hurlburt* v. *Bellows*, the court expressly decided that the contradictory declarations of a witness may be proved, after it is established that the party calling the witness was surprised at his testimony, and was not guilty of collusion or of any bad faith, and that the witness was adverse to the party calling him.

In this view of the matter, which we feel warranted from the state-ment of the case in adopting, it becomes unnecessary to enter upon the broad field of controversy which has been opened by the discussion by courts and text-writers of the general question, whether a party shall, in all instances, be permitted to prove the previous contradictory declarations of a witness whom he himself first called to the stand ;— a question left open in *Hurlburt* v. *Bellows*; a general proposition sup-ported by the weight of authority, according to Greenleaf, though doubted by Redfield, questioned by the court in *Ryerson* v. *Abington*, 102 Mass. 526, but strongly maintained by Phillipps. See 1 Gr. Ev., sec. 444, sec. 444 *a*, Redfield's ed. ; 2 Phil. Ev. 450–463 ; 1 Stark. Ev.

520. The latter author, after stating the prominent reasons for and against the admissibility of statements inconsistent with the witnesses' testimony on the stand, and reviewing the authorities, concludes that a sufficient answer to the proposition, that a man shall not give evidence to discredit his own witness, is, that "a witness ought not to receive more credit than he deserves; and, if he has given different statements of the same transaction, no wrong is done by proving them. Whether such proof may discredit him at all, or to what extent, the jury are to determine." Upon this general subject, the argument of the learned counsel for the plaintiff, in *Hurlburt* v. *Bellows*, 50 N. H. 106–115, is deemed worthy of attentive and serious consideration.

Our conclusion is, that the defendant's exceptions must be overruled, and there must be            *Judgment on the verdict.*